# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 99 C 7052 | DATE | JULY 11 , 2002 |
| CASE TITLE | CARMEN CLARA, etc. v. CITY OF CHICAGO, etc., et al. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motion for summary judgment [45-1] is granted. The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiff dismissing plaintiff's cause of action with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 4 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUL 1 5 2002 | |
| | Notified counsel by telephone. | | date docketed | 59 |
| | Docketing to mail notices. | | 15 | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 7/11/2002 | |
| | | courtroom deputy's initials | date mailed notice | |
| cw | | | mqm | |
| | | | mailing initials | |

U.S. DISTRICT COURT
CLERK
02 JUL 12 PM 12: 08

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CARMEN CLARA, as Special )
Administrator of the Estate of )
ARMANDO REYES, deceased, )
                                        )
                    Plaintiff, )
                                        )
        v. )                             No. 99 C 7052
                                        )
CITY OF CHICAGO, a municipal )
corporation, OFFICER LAWRENCE )
FOLEY, Star No. 1426, OFFICER )
EARL HERING, Star No. 11088, )
LIEUTENANT SCHWIEGER, Star No. )
389, DETENTION AIDE GLENN MURRY, )
No. 302194, DETENTION AIDE )
MARCUS KIMBROUGH, No. 302194, )
and DETENTION AIDE J. KEHOE, )
No. 304889, )
                                        )
                    Defendants. )

## MEMORANDUM OPINION AND ORDER

        The plaintiff in this action is Carmen Clara, the special
administrator of the Estate of Armando Reyes.  At approximately
1:00 a.m. on September 25, 1998, Reyes was arrested on suspicion
of burglary to auto and criminal damage to vehicle.  Reyes was
taken to a Chicago police station where he arrived approximately
4:30 a.m. and was detained another 36 hours without being
formally charged with an offense.  At approximately 4:30 p.m. on
September 26, 1998, Reyes was found in his cell hanging by his

t-shirt. Reyes could not be revived. Named as a defendant is the City of Chicago. Named as defendants in their individual capacities are Chicago Police Department ("CPD") officers Sergeant Lawrence Foley, Earl Hering, and Lieutenant David Schwieger, and CPD detention aides Glenn Murry, Marcus Kimbrough, and James Kehoe.[1] The Amended Complaint contains two counts. Count I is a claim under 42 U.S.C. § 1983 that defendants violated the federal Constitution by acting with deliberate indifference to Reyes's serious medical needs in failing to act with the care necessary to prevent his suicide. Count II is a supplemental state law claim that defendants' conduct was willful and wanton. Presently pending is defendants' motion for summary judgment.

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002); Hilt-Dyson v. City Of Chicago, 282 F.3d 456, 462 (7th Cir. 2002); Schneiker v. Fortis Insurance Co., 200 F.3d 1055, 1057 (7th Cir. 2000). The burden of establishing a lack of any genuine issue of material fact rests on the movant.

_____

[1] In response to defendants' motion for summary judgment, plaintiff concedes the claims against defendant Kehoe should be dismissed.

Outlaw v. Newkirk, 259 F.3d 833, 837 (7th Cir. 2001); Wollin v. Gondert, 192 F.3d 616, 621-22 (7th Cir. 1999). The nonmovant, however, must make a showing sufficient to establish any essential element for which she will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Billings v. Madison Metropolitan School District, 259 F.3d 807, 812 (7th Cir. 2001). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. Celotex, 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. See NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 236 (7th Cir.), cert. denied, 515 U.S. 1104 (1995); Covalt v. Carey Canada, Inc., 950 F.2d 481, 485 (7th Cir. 1991); Collins v. Associated Pathologists, Ltd., 844 F.2d 473, 476-77 (7th Cir.), cert. denied, 488 U.S. 852 (1988). As the Seventh Circuit has summarized:

> The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Logan v. Commercial Union Ins. Co., 96 F.3d 971, 978 (7th Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citation and internal quotation omitted)). The moving party may discharge this burden by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325, 106 S. Ct. 2548. Once the moving party satisfies this burden, the

nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant must do more, however, than demonstrate some factual disagreement between the parties; the issue must be 'material.'" Logan, 96 F.3d at 978. "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." Id. (citation omitted). In determining whether the nonmovant has identified a "material" issue of fact for trial, we are guided by the applicable substantive law; "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." McGinn v. Burlington Northern R.R. Co., 102 F.3d 295, 298 (7th Cir. 1996) (citation omitted). Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . .'" Logan, 96 F.3d at 978 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

Outlaw, 259 F.3d at 837.

In the Amended Complaint, plaintiff specifically recites the following customs or policies as being deliberately indifferent to the serious medical needs of pretrial detainees, including Reyes.

> (a) Allowed and encouraged members and employees of the Chicago Police Department to fail to conduct visual inspections of pre-trial detainees and/or prisoners at regular intervals;
> (b) Failed to regularly and properly train City of Chicago police officers and employees in

jail suicide prevention so that the officers were sufficiently familiar with required suicide prevention techniques;

(c) Allowed and encouraged members of the Chicago Police Department and its employees to detain and place in jail cells, pre-trial detainees and/or prisoners without first requiring the detaining officers and employees complete a suicide screening of the pre-trial detainee and/or prisoner;

(d) Allowed and encouraged members of the Chicago Police Department and its employees to detain and place in jail cells prisoners clearly appearing to be a suicide risk, without requiring either suicide restraints or constant and continual supervision;

(e) Allowed and encouraged members of the Chicago Police Department and its employees to not confiscate and take from the pre-trial detainees, any clothing and/or other device which could be used as an instrumentality for an attempted suicide;

(f) Adopted an informal policy and/or custom of not requiring all detaining officers and employees who place pre-trial detainees or prisoners who pose a risk of suicide into a jail cell, to report said risk to the watch commander on duty.

Am. Compl. ¶ 7.

In response to summary judgment, plaintiff relies on the following customs or policies as the basis for the City's liability: (1) a failure to ensure that Spanish speaking detainees are adequately screened and monitored for suicide risk; (2) a custom of failing to adequately monitor detainees; (3) failure to have a fingerprinting policy in place to ensure prompt processing of fingerprint checks so as to avoid unnecessarily long detentions; and (4) failure to adequately train aides and officers regarding lockup procedure and suicide detection. The City contends the first and third custom or

policy should be treated as waived because not alleged in the complaint. They also contend the failure to monitor claim should be treated as waived to the extent it relies upon deficient monitoring during the first 32 hours of detention that was performed by officers or aides other than the named individual defendants. Additionally, the individual defendants contend plaintiff's present contentions against them should be treated as waived to the extent plaintiff relies on a contention that the individual defendants caused Reyes's suicide by prolonging his detention. Compare Am. Compl. ¶ 8 with Pl. Answer to Sum. Jmt. § III(C).

It is well settled in the Seventh Circuit that a plaintiff cannot amend the complaint simply by making arguments in response to a motion for summary judgment. Whitaker v. T.J. Snow Co., 151 F.3d 661, 664 (7th Cir. 1998) (quoting Speer v. Rand McNally & Co., 123 F.3d 658, 665 (7th Cir. 1997) (quoting Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996))). However, it must be recognized that the Federal Rules of Civil Procedure are based on notice pleading; a plaintiff need not allege legal theories in a complaint nor need a plaintiff allege all the evidence and facts supporting a claim. McCormick v. City of Chicago, 230 F.3d 319, 324-25 (7th Cir. 2000); Forseth v. Village of Sussex, 199 F.3d 363, 368 (7th Cir. 2000); Scott v. City of Chicago, 195 F.3d 950, 951-52 (7th Cir. 1999); Daniels v. USS Agri-Chemicals, 965 F.2d 376, 381 (7th Cir. 1992); Hays v. General Electric Co., 151 F. Supp. 2d 1001, 1006 (N.D. Ill.

2001). The allegations need only be sufficient to place the defendant on notice of the gravamen of the complaint. Latuszkin v. City of Chicago, 250 F.3d 502, 504 (7th Cir. 2001); McCormick, 230 F.3d at 323-24. This rule applies equally to allegations of a municipal custom or policy. Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993); McCormick, 230 F.3d at 324-25. Thus conclusory allegations as to a policy or practice of the City or an act of a policymaking official would have sufficed. See id.

Here, plaintiff did not generally allege the existence of a custom or policy, instead choosing to recite particular policies or practices that are claimed to have been a cause of Reyes's suicide. The question is whether, absent amending the complaint, this limited plaintiff to the particular customs or policies identified in the complaint. This court does not construe the complaint in this narrow manner. Plaintiff was not required to plead all the evidence supporting her custom or policy claim. Moreover, defendants do not point to discovery materials indicating that they understood the complaint to be so limited. Although defendants assert that the "City was entitled to timely notice of plaintiff's alternative theories, and to conduct discovery and plan a defense," they do not expressly contend that they were unable to adequately prepare a defense. Defendants do not point to any interrogatories in which they requested that plaintiff specifically identify the theory of the case or identify the evidence that would be relied upon. See,

e.g., Holiday Inns, Inc. v. Robertshaw Controls Co., 560 F.2d 856, 857-58 (7th Cir. 1977); Zakaras v. United Airlines, Inc., 121 F. Supp. 2d 1196, 1215 n.39 (N.D. Ill. 2000); National Football League Properties, Inc. v. ProStyle, Inc., 16 F. Supp. 2d 1012, 1016-17 (E.D. Wis. 1998). Defendants also do not point to any area of discovery that they omitted developing in reliance on the allegations of the complaint. Furthermore, the burden is on plaintiff to prove the existence of a custom or policy. Since defendants would likely control the evidence necessary to meet that burden, it is unlikely that plaintiff could have developed proof of the additional theories without defendants being aware that plaintiff was inquiring as to the issue. Since defendants have not supported their waiver contention with background information or documentation showing that they were misled, failed to inquire into relevant materials, or were otherwise prejudiced, waiver will not be applied. In any event, plaintiff is unable to successfully prove any of the theories that defendants contend are waived.

Resolving all genuine factual disputes and drawing all reasonable inferences in plaintiff's favor, the facts assumed to be true for purposes of defendants' summary judgment motion are as follows. At approximately 1:00 a.m. on September 25, 1998, Reyes and Carlos Garcia were arrested after being identified by a witness as having been near a burglarized vehicle. The arresting officers are not named as defendants. At approximately 1:30 a.m., they arrived at the 25th District police station. An

- 8 -

arrest report was completed, including personal information as to name, address, occupation, place of birth, and that Reyes had no driver's license or social security number. A watch commander and assistant State's attorney approved charges of burglary to auto and criminal damage to vehicle. Reyes was not formally charged prior to his death. At approximately 4:30 a.m., the arresting officers transported Reyes to the 25th District lockup.

At the lockup, Reyes was questioned by lockup personnel and a "Screening Record" form was completed by nondefendant detention aide James Staunton, along with nondefendant police officer James Brogan. Staunton had worked as a detention aide since 1976. He had no formal training prior to becoming a detention aide, instead learning on the job. He did attend an eight-hour course on suicide prevention in the late 1980's and written guidelines regarding prisoner suicide were posted in the lockup as of September 1998. Brogan began his police academy training in October 1976 and began working in the 25th District lockup around 1993. The only formal lockup training that he received was during his initial time at the police academy. He received on-the-job training as to screening from other lockup officers when he first began in the lockup. He received no refresher or other formal training thereafter. Brogan relied on the posted guidelines to screen detainees for potential suicides. Similarly, nondefendant officer Anthony Lafata, who was filling in at the lockup when Reyes was brought in, did not have formal

lockup training and instead received on-the-job training from other lockup officers.

None of the CPD personnel in the lockup on September 25 or 26, 1998 spoke Spanish. Plaintiff disputes the accuracy of Reyes's Screening Record and the statements of lockup personnel, contending the information on the Screening Record must have been fabricated because Reyes did not speak English and the lockup personnel did not speak Spanish. According to Clara, who is Reyes's sister, Reyes spoke "a little bit" of English, but Spanish was his primary language, including the language he used at home and at work. Prior to his death, Reyes had been planning to take an English course. Still, the non-Spanish speaking arresting officer was able to complete an arrest report that had accurate information about Reyes's address, date of birth, being born in Mexico, being employed at a dry cleaning establishment, and not having a driver's license or social security number. The arrest report also included an alias and false information that Reyes had no prior arrests. The Screening Record also accurately reported that Reyes was not on medication, had not had past mental problems, and had not previously tried to kill himself. The ability to convey the minimal background information on the arrest report does not require an extensive command of the English language. A person could be able to respond to such questions without also having the ability to fully and accurately communicate information that would indicate he was suicidal. Nevertheless, Reyes's limited ability to speak English is not a

sufficient basis for reasonably inferring that the Screening
Record was fabricated. It will be assumed to be true, though,
that the Screening Record was completed based on an interview
that was limited in scope and reliability due to Reyes's limited
command of the English language. There is, however, no evidence
to support that, at the time he was processed, Reyes gave any
indication, in English, Spanish, or body language, that he was
suicidal or depressed.

Reyes was photographed at 4:45 a.m. on September 25 and
placed in cell number 7-2. This cell is not visible from the
desk of the lockup keepers/detention aides. Cellblock 3 contains
cells visible from the desk. There were video surveillance
cameras in the lockup, but they were not functioning on
September 26 and an attempt to fix them was unsuccessful.

In accordance with CPD policy, Reyes's cell should have
been observed at least every 15 minutes. However, logs from
prior to 1:30 p.m. on September 26 were destroyed in the ordinary
course of business prior to the filing of the present lawsuit.[2]
There is nothing to indicate that standard procedure was not
followed, though. Absent the logs, it may reasonably be
questioned whether each subsequent inspection was always
conducted within 15 minutes during the first 32 hours of Reyes's
incarceration. However, that is an immaterial fact because there
is also nothing to indicate that a greater number of visits

_____

[2]Internal investigators retained in their file the log
for the few hours prior to the suicide.

during that time period would have made a difference. Murry and Kimbrough worked on September 25, but there is no evidence that they observed any unusual behavior on the part of Reyes nor anything indicative of a potential for suicide. Neither is there any other competent evidence that Reyes acted unusual or gave any indication he was suicidal or depressed.

Murry began working as a detention aide in 1991 or 1992 and Kimbrough in 1996. Both attended a two-week training course to be a detention aide. There was some training on recognizing a potential suicide.[3] Neither received any refresher or new training on suicide prevention after the initial two-week detention aide training.

Defendant Murry began work at 1:30 p.m. on September 26, 1998. According to the log and Murry's testimony, he checked the cells shortly after he arrived. Nothing in the arrest report or Screening Record indicated a possible problem with Reyes. According to the log, Murry was also the one who checked the cells at 4:15 p.m. and 4:30 p.m. The log also indicates that defendants Kimbrough and Hering checked the cells between 3:15 p.m. and 4:00 p.m. According to the log, Reyes's hanging body was found at 4:32 p.m. Plaintiff disputes the accuracy of the log and defendants' testimony. According to a report

---

[3]A curriculum implemented in 1992 includes a two-hour course on suicide. This particular curriculum apparently was implemented after Murry was trained, but Murry testified he had some training on suicides.

completed by paramedic David Wiggins, who arrived shortly after Reyes's body was discovered, a detention aide told him the "last contact" with Reyes before his body was found had been 30 to 45 minutes beforehand. Defendants contend that "contact" could be understood as an actual conversation and therefore this statement may be consistent with the log and Murry's testimony. However, drawing reasonable inferences in plaintiff's favor, it would be assumed that Wiggins was informed that Reyes was not observed for 30 to 45 minutes before his body was found. Defendants also object to the admission of the statement in the paramedic report, characterizing it as hearsay of an unidentified speaker. The report, however, refers to a detention aide performing CPR, which other evidence shows would have been Murry. It can be inferred that the statement came from Murry.[4] Defendants do not specifically dispute that the paramedic report is a business record. The report itself and the limited testimony of Wiggins that is provided are consistent with the report being an admissible business record. As against Murry and the City, the document would be admissible as a party admission and it would otherwise be admissible at least to impeach Murry's testimony that he conducted the 4:15 p.m. and 4:30 p.m. checks.[5] <u>See</u>

_____

[4]The parties provide only a few pages of Wiggins's deposition testimony. It is possible he repeated the contents of the report at his deposition, but that cannot be assumed.

[5]Plaintiff also contends that Reyes being in rigor mortis at the time the paramedic arrived shows Reyes had been dead for some time and therefore not visited as often as indicated by the

<u>Traum v. Equitable Life Assurance Society of United States</u>,
2002 WL 1163725 *3-4 (N.D. Ill. May 31, 2002).

Reyes was fingerprinted when he was first processed at
the station. Reyes continued to be detained on September 26
because the processing of his fingerprints had not yet been
completed. Under CPD policy, a followup inquiry should have
been made when no report was received within 24 hours of the
fingerprinting.[6] Although Reyes was at the lockup for
approximately 36 hours, no followup inquiry had been made
regarding his fingerprints. As of September 25, 1998, a new
system was in place that still had some glitches. At the time,

---

log and defense testimony. However, the only evidence that the
body was in rigor mortis is a statement in the paramedic report.
While it is possible that a person other than a medical doctor
may have the expertise to testify as to a body being in rigor
mortis, <u>see, e.g.</u>, <u>Roberts v. State</u>, 272 Ga. 822, 537 S.E.2d 86,
91-92 (2000) (trained homicide investigator); <u>Commonwealth v.
Chism</u>, 480 Pa. 233, 389 A.2d 1041, 1052 (1978) (deputy coroner
who had previously been a police officer and who had specialized
training), it is not necessarily true that a paramedic has such
expertise, <u>see, e.g.</u>, <u>People v. Davis</u>, 209 A.D.2d 954, 620
N.Y.S.2d 20, 21 (1994), <u>vacated</u>, 212 A.D.2d 1066, 624 N.Y.S.2d
985 (1995). Plaintiff provides no evidence of Wiggins's training
that would show he has the expertise to identify rigor mortis.
Plaintiff also does not provide any testimony of Wiggins
describing the body that could be used by an expert to opine as
to Reyes's time of death. Therefore, the evidence before the
court is insufficient to draw any inference as to time of death
based on possible rigor mortis of the body.

[6]Plaintiff also points to § VII(A)(6) of CPD General
Order 92-05. That provision, however, only applies to
fingerprint <u>results</u> that have been transmitted back to the
lockup, but the transmittal was not received. There is no
contention in the present case that the fingerprint processing
was actually completed or that the district was informed of a
transmittal that was not received within eight hours.

it was not unusual for the processing to take more than 24 hours. When Schwieger arrived for work on the 26th, he was told that a number of detainees' fingerprint processing had not yet been completed within a 24-hour period. Defendant Foley, as the desk sergeant on duty, would have been responsible for making the followup inquiry.

Defendant Foley was the desk sergeant at the 25th District at the time Reyes committed suicide, and also worked there on September 25, 1998. He has worked for the CPD for approximately 25 years. He had some training on lockup duty during his initial police academy training. He had not had any retraining on lockup duty in at least five years. As desk sergeant, Foley was responsible for persons and property in the lockup, but detention aides were the ones more particularly responsible for observing the detainees. Prior to Reyes's suicide, Foley had toured the cellblock along with Kimbrough and observed nothing unusual. Also, no unusual behavior of Reyes had been reported to Foley.

Defendant Lieutenant Schwieger was the acting watch commander at the 25th District at the time Reyes committed suicide. He had worked for the CPD since 1968. Prior to 1998, Schwieger had not had any seminars or lectures dealing with suicide detection and prevention. Prior to Reyes's suicide, Schwieger had toured the cellblocks with Murry and observed nothing unusual. Also, he was not told of any unusual behavior on the part of Reyes.

Defendant Hering was a police officer who normally was assigned to foot patrol. At the time Reyes committed suicide, Hering was filling in as a lockup keeper.

Approximately 3:45 p.m. on September 26, detainee Ortiz, who spoke Spanish and English and was housed in the cell next to Reyes, informed Murry that Reyes was inquiring about his fingerprints and wanted to make a telephone call. Murry did not take any action in response to this request nor pass this information onto his supervisor.[7]

At approximately 4:32 p.m. on September 26, Murry discovered Reyes hanging by his t-shirt in his cell. Reyes was still wearing his sweatshirt.[8] Murry called out and Hering and Kimbrough responded. They lifted Reyes, removed the ligature, and lowered Reyes to the floor. Murry immediately began to perform CPR. Ambulance personnel were called and arrived by 4:47 p.m.

---

[7]Plaintiff also contends that Reyes told Ortiz that he was depressed about not making bond. However, the only evidence provided for this is the testimony of a Medical Examiner investigator that Ortiz told him about this conversation. That is hearsay evidence as to Ortiz's purported statement about the conversation. It cannot be credited. Also, there is no contention that Ortiz informed any lockup personnel about Reyes's purported statement.

[8]Plaintiff points to no evidence that Reyes had been wearing his t-shirt under his sweatshirt shortly before the suicide. Therefore, it cannot reasonably be inferred that Reyes took the time to remove his sweatshirt and t-shirt and put his sweatshirt back on shortly before his suicide.

Medical examiner Thamrong Chira, M.D., came to the lockup and pronounced Reyes dead. Chira found no evidence that Reyes had been handcuffed, no defensive wounds, no evidence of excessive force, nor anything else suspicious. Chira's findings support the conclusion that Reyes died from hanging. At the time of his examination at the Medical Examiner's office, Chira noted rigor mortis. This examination, however, began at 8:20 a.m. on September 27. See Chira Dep. at 34-36.

CPD policy requires that lockup cells be inspected every 15 minutes. This exceeds the state standard of once an hour. General Order 88-11 also requires that (a) all arrestees be searched and items that could cause injury removed; (b) the arrestee's shoelaces, tie, belt, muffler, or anything that could obviously be used as a ligature be removed; (c) all arrestees be observed and questioned about their health, potential for suicide, and use of alcohol and drugs, and that this information be recorded on the screening record which is to be signed by the officer or detention aide completing the form; and (d) the district watch commander and desk sergeant personally inspect the lockup at least twice during each eight-hour tour of duty. General Order 88-11 does not address the topic of detainees who do not speak English. General Order 93-4 requires that each district lockup have an emergency plan and that all lockup personnel be familiar with it.

The CPD requires additional procedures for handling potentially suicidal detainees in lockups. When a lockup officer

becomes aware of a detainee who may be suicidal, the officer is to report it to the watch commander, who will decide whether or not to hospitalize the detainee. The lockup officer may place the detainee in a cell that is in view of where the officer normally works and/or place the detainee in a cell with another detainee. If necessary, the detainee may be handcuffed to a spot where the detainee is more visible and/or away from more dangerous parts of the cell. Paper clothes are available so that the detainee does not have clothes with which to hang him or herself.

Dr. Chira testified that 50% of the jail hangings that he has investigated involved use of a t-shirt as the hanging instrument. During the time preceding Reyes's suicide, there were three suicide attempts at the 25th District lockup of which Schwieger and Murry were aware. Murry was on duty for at least two of the attempts and prevented one of the attempts from resulting in a death.

A 1982 CPD trainee manual entitled "Receiving Screening for Medical Emergencies and Potential Suicides in District Lockups" contains a table showing there were a total of 22 suicides at District lockups between February 20, 1979 and December 7, 1981.[9] One of the mock cases in the manual refers to a detainee who spoke Spanish and little English. A question posed at the end of the case is whether the fact the detainee

---

[9]Defendants do not dispute the accuracy of these statistics.

spoke little English was of concern. No evidence is presented as to when this manual was used for training.

Plaintiff provides a document, Pl. Exh. S, that purports to show that 19.6% of all arrestees in Chicago are Hispanic and that 36.7% of those arrested in the 25th District are Hispanic. However, no foundation is provided for the table and it is not labeled as showing arrests.[10] Instead, it is titled "1990 Population by Police District" and appears to be population data broken down by Chicago's police districts, not numbers for arrests. Judicial notice is taken that the number plaintiff cites as being the total number of arrests in Chicago (2,783,726) matches the 1990 census population for Chicago. To the extent the table contains admissible evidence, at best it shows the percentage of Hispanics residing in Chicago and the 25th District in 1990.[11] It does not show arrest numbers, nor the percentage of Hispanics residing in the 25th District in 1998, nor the percentage of persons residing in the 25th District who speak Spanish and little or no English. For purposes of ruling on the motion for summary judgment, though, it will be assumed to be

_____

[10]Defendants also object that the document was not provided in discovery, but they point to no discovery request they made for which the document would have been responsive.

[11]Markings on the document indicate it was taken from a City of Chicago website. That website currently lists data based on the 2000 census indicating that, as of 2000 (which is closer to 1998 than 1990), Chicago was 26.1% Hispanic and the 25th District's population was 56.8% Hispanic. See http://www.cityofchicago.org/communitypolicing/Statistics/PopByDistrict.html.

true that, as of September 1998, Chicago's population was approximately 25% Hispanic and the 25th District's population was approximately 50% Hispanic. There is nothing to specifically indicate what percentage of the Hispanic population does not speak English nor what percentage of the arrestees in the 25th District are Hispanic or do not speak English.

Plaintiff submits the report of an expert witness, Robert Di Grazia, along with his curriculum vitae. Defendants object that the report is inadmissible evidence because not supported by an affidavit or the deposition that was taken of Di Grazia. Although, for purposes of summary judgment, an expert's report generally will be sufficient to show what the expert's testimony would be at trial, where an objection is raised the report must be supported by a sworn statement, declaration, or deposition testimony. See Wittmer v. Peters, 87 F.3d 916, 917 (7th Cir. 1996), cert. denied, 519 U.S. 1111 (1997) (dictum); Ogborn v. United Food & Commercial Workers, Local No. 881, 2000 WL 1409855 *6 (N.D. Ill. Sept. 25, 2000); Provident Life & Accident Insurance Co. v. Goel, 274 F.3d 984, 1000 & n.77 (5th Cir. 2001); Sofford v. Schindler Elevator Corp., 954 F. Supp. 1459, 1463 (D. Colo. 1997). Here, however, the objection was raised in defendants' reply and plaintiff has not had the opportunity to provide the additional support. Compare Ogborn, supra. Presumably, plaintiff would be able to provide an affidavit or declaration of Di Grazia incorporating the opinions of his report. Therefore, the report will be considered in determining

whether a genuine factual dispute exists.  Cf. Burton v. R.J. Reynolds Tobacco Co., 181 F. Supp. 2d 1256, 1261 n.2 (D. Kan. 2002).

Di Grazia opines that, under ideal conditions, detainees should be visited at least every 15 minutes.  In situations such as the 25th District lockup in September 1998, where video monitoring equipment was not functioning, he opines that the visits should be more frequent.  Di Grazia also opines that 36 hours is an inordinate period of delay that can cause problems and that it was inadequate police procedure not to follow up on the failure to timely process fingerprints.

Defendants provide the deposition testimony of a licensed clinical psychologist who examined the pertinent reports in this case and read some of the depositions.  Based on the facts he assumed to be true, he opined that there were no objective factors indicating Reyes was suicidal.[12]

Under the Fourteenth Amendment's due process provisions, a pretrial detainee has the right to be protected from self-destructive acts such as suicide.  Frake v. City of Chicago, 210 F.3d 779, 781-82 (7th Cir. 2000); Anderson v. Templeton, 2002

---

[12]Defendants also provide the deposition testimony of a former Director of the Illinois Department of Corrections who opines that defendants did not do anything wrong.  The deposition testimony provided does not specify the evidence or facts upon which he relies nor does it contain much beyond bare conclusions. This deposition testimony is insufficient to establish that defendants acted in conformity with recognized practices.  See Boncher v. Brown County, 272 F.3d 484, 486 (7th Cir. 2001).

WL 226882 *2 (N.D. Ill. Feb. 14, 2002). However, individual state actors and a municipality can only be liable if they were deliberately indifferent to this right. Frake, 210 F.3d at 781; Boncher v. Brown County, 272 F.3d 484 (7th Cir. 2001). "A finding of deliberate indifference requires a showing that the officials were aware of a substantial risk of serious injury to the detainee but nevertheless failed to take appropriate steps to protect him from a known danger. A defendant is not, however, required to guarantee the detainee's safety. The existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent." Frake, 210 F.3d at 782 (citations omitted). As to the City, it must be shown that Reyes's suicide was caused by a deliberately indifferent custom or policy of the City. Id. at 781.

As to the individual defendants, there is no competent evidence from which it can be found that any of them were aware that Reyes represented a risk of suicide. None of them had any basis for recognizing that he should be placed on any degree of special suicide watch. Therefore, there is no possible basis for a reasonable trier of fact concluding that any of the individual defendants were deliberately indifferent because aware of a substantial risk of injury for which they failed to appropriately respond. See Boncher, 272 F.3d at 487-88. At most, plaintiff has shown that Murry (and possibly Kimbrough and Hering) were responsible for letting up to 45 minutes pass without observing

the cells and that Foley (and possibly Murry) were responsible
for failing to adequately follow up on the delayed processing of
fingerprints. But without any knowledge, or even indication,
that one of the detainees represented a substantial suicide risk,
such conduct would be negligence at most, not deliberate
indifference. The federal claim against the individual
defendants will be dismissed.

It still must be considered whether the City may be
liable based on a deliberately indifferent custom or policy that
was a cause of Reyes's suicide. Plaintiff identifies four bases
for holding the City liable: (1) failure to adequately provide
for the screening and monitoring of Spanish speaking detainees;
(2) failure to adequately monitor Reyes during his detention
at the lockup; (3) deficient fingerprinting practices; and
(4) failure to adequately train lockup personnel.

The evidence before the court supports that the City has
no formal policy specifically addressing the issue of screening
or monitoring non-English speaking arrestees for suicide
potential. However, plaintiff does not present evidence to
support either that this lack of a policy constituted deliberate
indifference to a known suicide risk or that it was a cause of
Reyes's death. As of September 1998, Chicago had a substantial
Hispanic population and the 25th District had a majority or near-
majority Hispanic population. Although no precise numbers or
even estimates are provided, it is likely true that, as of 1998
and for a number of years prior thereto, a number of 25th

District arrestees each year spoke Spanish and not English. However, it is a substantial leap from there to conclude that a substantial risk of suicides existed absent a policy addressing how to screen such persons for suicides. Even as to suicides of detainees generally, plaintiff does not point to sufficient evidence of a problem. She points to 20-year-old data as to suicides in lockups. Plaintiff herself submits evidence that a new training program was implemented subsequent to that data period. She also points to evidence of three attempted suicides at the 25th District during an unspecified time period preceding Reyes's suicide. Raw numbers as to suicides or attempts, however, are, by themselves, insufficient to draw conclusions as to the extent of the problem. See Boncher, 272 F.3d at 486-87. On the other hand, one or two suicides coupled with other background evidence may be sufficient to show deliberate indifference. See Frake, 210 F.3d at 782. See also Butera v. Cottey, 285 F.3d 601, 607-08 (7th Cir. 2002). Plaintiff, though, does not tie the minimal data she provides[13] to other evidence from which deliberate indifference may be inferred. There is nothing from which it may be concluded that the City's suicide prevention policies were deficient as regards Hispanics who did not speak English. Plaintiff does point to the one hypothetical problem in the 1982 training manual regarding a non-English speaking detainee. That, however, does not show that then, or in

---

[13]It is noted that none of the data provided indicates that any of the suicides were by non-English speaking detainees.

1998, the City was aware of a substantial suicide risk created by such situations.

But even assuming the City was deliberately indifferent to a substantial risk by failing to specifically address this issue, there is no evidence that this lack of a policy was a cause of Reyes's death. There is no evidence that, had he been screened and/or monitored by a Spanish-speaking officer or aide, Reyes would have disclosed information indicating he was depressed or suicidal. There is no competent evidence that, prior to his suicide, Reyes gave any indication that he was contemplating suicide. Neither is there even any testimony from any type of mental health expert that a person in Reyes's situation is likely to have made such a revelation if adequately screened or monitored. On the evidence presented, a reasonable trier of fact could not find that Reyes's suicide would have been prevented had the City had a policy regarding screening and monitoring detainees who did not adequately speak English.

Plaintiff also contends that the City is liable because it is responsible for the failure to adequately monitor Reyes during the first 32 hours he was detained in the lockup. Plaintiff contends that an adverse inference can be drawn from the destroyed log sheets, including an inference that Reyes did indeed disclose his suicidal tendencies during that time period and thereafter action was not taken to monitor him in light of such a disclosure. However, since the log sheets were destroyed prior to the filing of suit and in accordance with an established

document retention policy, the bad faith destruction necessary to draw an adverse inference cannot be found. <u>Miksis v. Howard</u>, 106 F.3d 754, 763 (7th Cir. 1997); <u>Coates v. Johnson & Johnson</u>, 756 F.2d 524, 551 (7th Cir. 1985); <u>Beniushis v. Apfel</u>, 2001 WL 303548 *4 (N.D. Ill. March 27, 2001).  There is no evidence to support that Reyes disclosed any suicidal tendencies during the first 32 hours he was in the lockup.

But even if plaintiff's claimed adverse inferences could be drawn, it would not be a basis for holding the City liable. There is no <u>respondeat superior</u> liability for § 1983 claims. Even if an employee or employees on duty during the first 32 hours was aware of Reyes's suicidal inclination and acted with deliberate indifference by failing to report it or do anything in response, there is no evidence that such conduct was pursuant to a policy or custom of the City.  The City's written policy is to monitor cells at least every 15 minutes and to hospitalize or specially monitor detainees indicating they are suicidal.  There is no evidence of a regular custom or practice contrary to the written policy.

As to conduct during the last few hours of Reyes's detention, it has already been discussed that the individual defendants did not act with deliberate indifference.  But again, even if they did act with deliberate indifference, there is no evidence of a custom or policy that would also make the City liable for such conduct.

Plaintiff also contends that the City should be held liable because it had deficient fingerprinting practices. There is evidence that, as of September 1998, glitches in a new system resulted in a number of delays in processing fingerprints. However, the only evidence is that these delays were caused by implementing a new system for which problems were being resolved. There is no evidence that this was a regular and customary practice, not just a temporary problem with a new system. There is also no evidence that the City acted in a deliberately indifferent manner in failing to attempt to eliminate the problems in the system. Moreover, it is undisputed that the City had a written policy requiring that personnel inquire when there were delays in processing fingerprints. There is evidence before the court that, in Reyes's case, responsible individuals failed to perform the required followup inquiries. There is no evidence that such failures were regular and customary. Since there is no evidence of a policy or practice of failing to timely inquire regarding delays in fingerprint processing, the City cannot be held liable for any such negligence of its employees.

Last, it is contended that the City failed to train adequately its lockup personnel in suicide screening and detection. Other than a lack of training as to dealing with non-English speakers,[14] plaintiff does not point to a specific

---

[14]As is discussed above, the lack of any specific policy regarding preventing the suicide of non-Englishing speaking detainees was not deliberately indifferent nor a cause of Reyes's

deficiency in the City's training. She only contends that the personnel on duty did not have recent or lengthy enough training. The record is insufficient to support a conclusion that the City's training was deficient or deliberately indifferent. But, even if such a conclusion were supported by the evidence, there is still no evidence that deficient training was a cause of Reyes's death. There is still evidence from which it can be found that Reyes engaged in conduct which well-qualified screeners or monitors would have recognized as indicative of suicidal tendencies.

For the foregoing reasons, the federal claim against the City will be dismissed.

Since the federal claim is being dismissed, ordinarily the merits of the supplemental state law claim would not be considered. See 28 U.S.C. 1367(c)(3). However, where a supplemental state law claim involves issues similar to a federal claim and can be readily resolved on similar grounds, it is appropriate to address the merits of the state law claim. See Rothman v. Emory University, 123 F.3d 446, 454-55 (7th Cir. 1997). Plaintiff does not dispute that she would have to show willful and wanton conduct to hold defendants liable on her state law claim. Illinois's willful and wanton standard is "remarkably similar" to the federal deliberate indifference standard. Chapman v. Keltner, 241 F.3d 842, 847 (7th Cir. 2001); Payne v.

---

death. Similarly, the lack of training as to such a policy cannot be a basis for liability.

Churchich, 161 F.3d 1030, 1042 n.13 (7th Cir. 1998), cert. denied, 527 U.S. 1004 (1999). Just as plaintiff failed to show that defendants acted with deliberate indifference, she cannot show that they acted willfully and wantonly. Count II will also be dismissed.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment [45-1] is granted. The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiff dismissing plaintiff's cause of action with prejudice.

ENTER:

William T. Hart
UNITED STATES DISTRICT JUDGE

DATED: JULY 11 , 2002